In the Matter of SOUTH BAY DEVELOPMENT CORP., Respondent, v
BOARD OF ASSESSORS and/or the ASSESSOR OF THE COUNTY OF
NASSAU et al., Appellants.

Second Department, May 20, 1985

APPEARANCES OF COUNSEL

*Edward G. McCabe, County Attorney* (*Robert T. Bloom* of counsel), for appellants.

*Costigan, Hyman, Hyman & Martone, P. C.* (*Jay M. Herman* and *M. Allan Hyman* of counsel), for respondent.

**OPINION OF THE COURT**

WEINSTEIN, J.

At issue are the permissible and appropriate methods for valuing condominium properties for real estate tax assessment and review purposes.

The subject 65,750-square-foot property is located in the Incorporated Village of Freeport, Nassau County. The parcel is improved with a 61-unit, four-story and penthouse condominium apartment house and a detached two-story one-family superintendent's dwelling. The southerly portion fronts on Randall Bay and is bulkheaded. There are 18 boat slips, 18 enclosed spaces and 73 outdoor parking spaces.

The petitioner's appraisal expert (Bernard Goodman) utilized an income capitalization approach. He reported that since the condominium "tenants" are the owners of their individual apartments, a market rental must be calculated from comparable rental data.

He made a study of allegedly "comparable" *rental* apartment buildings and certain leases of units from the subject property to derive an economic market monthly rental per room which he imputed to the rooms in the various apartments in the subject condominium. By this means he derived total annual rental values for the subject condominium for each year under review. He deducted expenses and derived net income figures. Utilizing capitalization of income techniques, he derived his valuations.

The appraisal expert (Michael Haberman) of the appellants the County of Nassau and its Board of Assessors considered the market, income and cost approaches in estimating market value but stated that he placed his "final reliance" on the market approach "since the subject is a condominium and best measured by sales data". The sales data used in his market approach were sales of condominium units within the subject property.

In his market approach, appellants' appraiser reported that "[t]he market data [sales] approach to value is usually the most accurate method in estimating the value of a condominium. This appraiser has relied upon the actual unit sales [prices] of [that is, within] the Subject [condominium] Property to determine the

gross sell out potential". In essence, he *totaled* the averages of the *actual* sales prices for each type unit and called that total *"Potential* Sell-Out" (emphasis supplied).

His report reflects awareness of certain problems with merely totaling the selling prices of condominium units, viz., a hypothetical purchaser of all of the condominium units in bulk at a market value equal to the total of the actual (average) selling prices of the condominium units would not obtain any profit on the resale of the complex of units unless he could purchase at a discount. Further, during the resale period he would incur various operating and carrying expenses. Accordingly, appellants' appraiser took certain deductions from his total "Potential Gross Sell-Out" price. Among those deductions were allowances for a margin of profit, sales and overhead expenses. To insure that his wholesale market approach valuation did not exceed the ceiling of reproduction cost less depreciation, appellants' expert buttressed his appraisal with an engineering report.

The seed case for valuation of condominiums is *Matter of Marks v Pelcher* (89 Misc 2d 560, *revd* 58 AD2d 812, *affd* 49 NY2d 954). In *Marks,* as at bar, the petitioners' appraiser valued the property by the income approach. He treated the condominium as if it were a conventional rental apartment property and imputed a market rental to the individual units. Using capitalization of income techniques he derived his valuations of the property as an entity and arrived at the assessed value of the individual units by applying against the over-all valuation the percentage that each owner's interests in the common elements bore to the whole. In that case, it was the opinion of petitioners' expert appraiser that an identical rental apartment and condominium, existing side by side, must be appraised alike, and he evaluated the condominium complex as if it were a multifamily garden-apartment house project.

In *Marks (supra)*, petitioners' appraisal methods were supported by some expert authority. The trial court noted (*Matter of Marks v Pelcher, supra,* p 563): "Petitioners' position is supported by a memorandum issued by the State Board of Equalization and Assessment which, in part, states: 'the assessor, when he *first* appraises a condominium, [should] ignore the Declaration provisions, ignore the sale prices obtained for the individual units by the promoters and ignore the common elements. He should step away from the condominium and apply the indicia of value which a purchaser would consider if he bought not a unit, but the whole property' (Memorandum dated August 23, 1974, p 3; emphasis supplied)."

However, the county's expert in *Marks* (*supra*), like appellants' expert in the case at bar, turned to condominium sales prices and used a market data approach. The resultant valuations of the separate units were then summed up, to arrive at valuations of the property as a whole. The county's appraiser used this method, notwithstanding the fact that Real Property Law article 9-B, § 339-y (since amended) (popularly known as the Condominium Act) stated: "In no event shall the aggregate of the assessment of the units plus their common interests exceed the total valuation of the property were the property assessed as a parcel".

The *Marks* trial court cited the statistics of what it termed "gross sell out price" (89 Misc 2d, p 567) obtained by the condominium developer on the sales of the condominium units, further cited resale prices of units within the complex (pp 566-567), and held, *inter alia* (p 569):

"Reference to the table shows petitioners' method of appraisal consistently resulted in valuations significantly below those found by respondent through the use of comparable sales. Furthermore, the value placed on each unit by the respondent, with limited exceptions (cf. chart on page 566), is comfortably under the unit's resale price, and without exception, is well above the assessed value of the individual units.

"One conclusion to be drawn from the statistics gathered by respondent's expert is that there is ample market data from which the value of the individual units can be determined without resort to the artificial comparison with conventional rental structures. The other is that a compressed assessment of each unit so that the aggregate assessment of all units will not exceed the value of the property as a whole produces a valuation substantially less than the 'full value' of each separate unit. The imposition of such method of assessment under the circumstances prevailing here, is illegal, as noted before. The court is accordingly compelled, on the basis of the evidence before it, to reject the approach to valuation used by petitioners."

The *Marks* trial court held (*supra,* p 566) "the ceiling formula in section 339-y to be invalid and unenforceable where it compels the assessment of the individual units at less than true value". It concluded that petitioners had not sustained their burden of proving the assessments were incorrect. The proceeding was dismissed in toto.

This court reversed that determination (*Matter of Marks v Pelcher,* 58 AD2d 812, *supra*) and remitted the proceeding to Special Term for valuation pursuant to Real Property Law

§ 339-y (since amended), our decision stating, in pertinent part (p 812): "Section 339-y of the Real Property Law contains the caveat that the aggregate of the assessments of condominium units, plus their common interests, may not 'exceed the total valuation of the property were the property assessed as a parcel.' The statute means what it says, and was so intended. The fact that owners of condominium units may allegedly be exempt from assessment of their individual units at 'full value' does not create an invidious classification. It is not improper for the Legislature to encourage condominium ownership".

On retrial of the *Marks* case, the trial court found new values by applying the *income* approach although it clearly doubted the accuracy of the income approach in such a case. The court also expressed certain reservations concerning the use of the *market* approach in condominium valuations. As was to be later noted in *Matter of River House-Bronxville v Hoffman* (101 Misc 2d 422, 425, *revd* 79 AD2d 990), the court, on retrial of the *Marks* case: "found new values by applying an income approach by virtue of the Appellate Division's decision, although he clearly doubted the accuracy of an income approach in such case. He stated: 'The most disturbing factor concerning the use of the income approach is the unanimous agreement among published authorities that the realities of the market place preclude its application when condominium development constitutes the highest and best use of the land (citing authorities).' (NYLJ, June 14, 1978, p 16, col 5.) He further commented on the respondents' use of a market approach involving the hypothetical sale of the entire complex to a single user and correctly pointed out: 'The impracticality of this approach compels its rejection. Clearly, if all 224 owners sold at market value, there would be no margin of profit which the purchaser could realize on the resale of the units, and he would, in addition, incur the expense of maintaining the property over his sellout period.'"

The *Marks* case went to the Court of Appeals (*Matter of Marks v Pelcher,* 49 NY2d 954, *supra*), which affirmed the judgment issued after retrial and also affirmed the order of this court which had reversed the judgment entered after the first trial. The Court of Appeals stated that its affirmance was for the reasons stated in the memorandum of this court.

In the valuation of *cooperative* properties, there was a parallel effort by the municipal authorities to utilize the market data approach rather than an imputed income approach (*Matter of River House-Bronxville v Hoffman, supra*). This court, in a later decision rendered in that case (*see, Matter of River House-Bronxville v Gallaway,* 100 AD2d 970, 971), noted:

"When the original trial was held on June 4, 1979, in reported cases involving the review of assessments on cooperative apartment buildings, the experts employed by the litigants generally utilized the capitalization of net income approach to value, determining estimated annual gross income by treating the property as though it were a commercial venture (i.e., a conventional apartment property) and imputing rental value to the cooperative building by comparison to rental properties (see *Matter of Milton Harbor Co. v Assessor of City of Rye,* 47 AD2d 632; *Matter of 800 Fifth Ave. Corp. v Tax Comm.,* 20 AD2d 879, affd 17 NY2d 794). Accordingly, at the original trial the experts for both the petitioner and the appellants used the income approach (*Matter of River House-Bronxville v Hoffman,* 101 Misc 2d 422, 423, revd 79 AD2d 990, *supra*).

"On advice of counsel, the appraiser for the municipalities also utilized a market data approach and relied upon it as the primary indicator of value. Under that method the market values of the individual cooperatives in the building were determined by examination of the actual sales of cooperative apartments on the property and in comparable cooperative buildings (*Matter of River House-Bronxville v Hoffman,* 101 Misc 2d 422, 423, *supra*). The method as used at the original trial was subjected to various adjustments, including a 20% discount factor that an investor would demand for the risk and expense of holding the property prior to its sale."

At the first trial in *River House,* the trial court concluded that the statutory ceiling on condominium valuations did not apply to cooperatives and that the market data approach — with certain adjustments — could be used. The assessments were thereupon sustained, utilizing that method (*Matter of River House-Bronxville v Hoffman,* 101 Misc 2d 422, 425-426, *supra*).

On appeal, this court reversed and remitted the matter for a hearing (*see, Matter of River House-Bronxville v Hoffman,* 79 AD2d 990, *supra*). The remittitur was for the purpose of receiving further evidence on the issue of the percentage of discount to be taken for specified factors in the market data approach and also to receive evidence on the issue of the reproduction cost less depreciation ceiling on building value. Subsequently, in *Matter of 200 Country Club Assoc. v Board of Assessors* (83 AD2d 637, 638), this court held that the market data method (used therein by appellants' appraiser) for valuing a cooperative apartment complex "clearly was not invalid as a matter of law" (citing *Matter of River House-Bronxville v Hoffman,* 79 AD2d 990, *supra*).

In *River House (supra)*, the hearing on the remittitur was held on October 19, 1981. In our second *River House* decision, we were to note, with respect to that hearing (*Matter of River House-Bronxville v Gallaway, supra,* p 972): "After the hearing was closed and prior to the rendition of a decision by the trial court, the Legislature enacted a new section 581 of the Real Property Tax Law (L 1981, ch 1057, § 4, eff Dec. 3, 1981). Subdivision 1 of the statute provides in pertinent part: 'Notwithstanding any other provision of law, real property owned or leased by a *cooperative* corporation or on a *condominium* basis shall be assessed for purposes of this chapter at a sum not exceeding the assessment which would be placed upon such parcel were the parcel not owned or leased by a cooperative corporation or on a condominium basis'" (emphasis supplied).

The hearing court had to consider the new statute because it was enacted after the close of the hearing but before the court rendered its decision on April 29, 1982. In its decision, the hearing court held: "'Under the new statute therefore, condominiums and cooperative apartment buildings are to be assessed as if they were conventional apartment houses, the occupants of which are rent paying tenants. It has long been the law in New York that the preferred method of valuing such income producing properties is the income approach. *People ex rel Parkin Operating Corp. v Miller,* 287 NY 126; *People ex rel Gale v Tax Commission,* 17 AD2d 225. Thus it appears that the effect of the new statute is to reinstate the income approach as the preferred method of valuing cooperatives for assessment review purposes and to effectively overcome this Court's reliance upon the market data approach in this case. (See also the case of *Matter of 200 Country Club Associates v Board of Assessors,* 83 AD2d 637)'" (*Matter of River House-Bronxville v Gallaway,* 100 AD2d 970, 972-973, *supra*).

The hearing court then analyzed the "retroactivity" problem and concluded that the new statute was *applicable* and must be followed because this court had *reversed* the original judgment and order, and, therefore, the matter was still open and pending. Accordingly, the hearing court adopted *income* approach valuations — those of the expert for the appellants — and directed submission of a judgment applying stipulated equalization ratios to those *income* approach fair market values. Subsequently, judgment was entered reducing the assessments for the three tax years in issue.

In affirming that determination, this court noted:

"Although section 581 of the Real Property Tax Law took effect on December 3, 1981, the intent of the statute is made clear in the following excerpt from the memorandum submitted by the State Board of Equalization to the Legislature (Bill Jacket, L 1981, ch 1057):

" 'A. *New Valuation Methodology*

" 'The assessment of co-operatives, *condominiums* and "rental property", would be governed by a new section 581 of the Real Property Tax Law. Subdivision one would require assessors to ignore the form of ownership of a co-operative or condominium in valuing such properties. The assessment would be limited to "a sum not exceeding the assessment" which would have been made had there been no co-op or condominium ownership.

" 'In part, this is intended to reverse the trial court decision in *Matter of River House-Bronxville v. Gallaway,* 101 Misc. 2d 422, and the Appellate Division (2d Dept.) holding in *Matter of 200 Country Club Associates* [83 AD2d 637]. In each case, the Court said it was not improper for the assessor to consider selling prices of shares of a co-operative apartment complex in determining the value of the co-op. We assume the effect of subdivision one would be to require the assessor to ignore these selling prices and to consider the income stream of similar non-co-op, rental buildings' " (*Matter of River House-Bronxville v Gallaway, supra,* pp 973-974; emphasis supplied).

In the instant case, the trial court stated that on remittitur in the *River House* case, the hearing court "ruled the propriety of employing a wholesale market approach to the valuation of cooperatives and condominiums had been laid to rest by the 1981 enactment of Section 581 of the Real Property Tax Law" and that "[t]his court agrees with that determination". The trial court further noted: "Subdivision 1 of section 581 provides that 'notwithstanding any other provision of law, real property owned or leased by a cooperative corporation or on a condominium basis shall be assessed * * * at a sum not exceeding the assessment which would be placed upon such parcel were the parcel not owned or leased by a cooperative corporation or on a condominium basis.' The statute, as amended, requires that condominiums and cooperatives be assessed as if they were conventional apartment houses whose occupants were rent paying tenants. Counsel for petitioner contends the phrase 'shall be assessed' creates a new assessment standard and may not be applied retroactively. In the opinion of the court, the 1981 amendment was enacted for the purpose of overturning the original holding in *Riverhouse* and reinstating the longstanding

rule that cooperatives and condominiums be valued by an income approach (*Matter of Marks* v. *Pelcher,* 58 AD2d 812, affd. 49 NY2d 954; *Milton Harbor Co.* v. *City of Rye,* 47 AD2d 632; *Matter of 800 Fifth Avenue* v. *Tax Commission,* 20 AD2d 879, affd. 17 NY2d 794; *see, also, Legislative Memorandum,* dated November 5, 1981, of State Board of Equalization and Assessment, in opposition to S. 7000A [Laws 1981, c. 1057]). In recognizing that settled rule, the Appellate Division, in the *Marks* case, reflected: '[I]t was within the realm of legislative discretion to require that assessments of condominium units be on the same basis as that of units in a cooperative corporation' (58 AD2d 812). The new statute, in the court's opinion, does no more than confirm that the assessment practice shall conform to the method of valuation".

Accordingly, the trial court utilized an income capitalization approach to derive market values and render judgment.

However, appellants set forth a highly complex, detailed argument in support of the "discounted gross sellout" market approach utilized by their appraiser. Appellants' principal arguments are threefold: (1) The discounted gross sell-out approach utilized by their appraiser "is consistent with the controlling appraisal premise [existing] before RPTL section § 581, Subd. 1" was enacted (eff Dec. 3, 1981); prior to that statute the "common law permitted consideration of condominium or cooperative development value under a discounted gross sellout approach". (2) In tax assessment valuation of both condominiums and cooperatives, "the discounted gross sellout approach is consistent with the appraisal premises under [the newly-enacted] RPTL § 581, Subd. 1". (3) If, arguendo, Real Property Tax Law § 581 (1) prohibits the discounted gross sell-out approach, the prohibition is *prospective* and may not be applied to assessments made, or to tax certiorari proceedings instituted, prior to its effective date.

I

WAS THE DISCOUNTED GROSS SELL-OUT MARKET APPROACH
AUTHORIZED BY THE COMMON LAW PRIOR TO REAL PROPERTY
TAX LAW § 581(1)?

Appellants first define the "gross sellout value" concept of a market data approach, as follows: "In the case of a condominium development, the gross sell-out value represents the aggregate amount of the projected retail prices to be received from the sale of the individual units. In the case of a cooperative development, the gross sell-out value represents the aggregate retail price of the individual cooperative shares plus the outstanding balance of the existing blanket mortgage".

Although *Matter of Marks v Pelcher* (58 AD2d 812, *affd* 49 NY2d 954, *supra*) involved valuation of *condominium* property, at bar petitioner binds condominium valuation to cooperative valuation by reference to the last three sentences of this court's decision in *Marks*. In *Marks,* after quoting a pertinent portion of Real Property Law § 339-y stating that the aggregate of the assessments of condominium units plus their common interests may not "exceed the total valuation of the property were the property assessed as a parcel" and stating that the statute "means what it says, and was so intended", we turned to the question of whether that statute invidiously discriminated in favor of condominium ownership, and noted (p 812): "The fact that owners of condominium units may allegedly be exempt from assessment of their individual units at 'full value' does not create an invidious classification. It is not improper for the Legislature to encourage condominium ownership and, insofar as the real property tax thereon is concerned, *place it on a par with ownership of shares in a co-operative corporation.* Further, since real property assessments are in rem, and property may not be assessed above full value (NY Const, art XVI, § 2), it was within the realm of legislative discretion to require that *assessments of condominium units be on the same basis as that of units in a co-operative corporation"* (emphasis supplied).

Appellants contend that that decision interpreting Real Property Law § 339-y specifically prohibited "the gross sell-out approach", but that "no other valuation approaches were specifically prohibited as a matter of law". It is asserted that the lesson of this court's decision in *Marks* was that, in light of the ceiling proviso in Real Property Law § 339-y, "the [correct] appraisal premise" for valuing condominium property is to obtain "the *single parcel value* of the entire development as an *undivided, vacant* multiple dwelling" (emphasis supplied). It is argued that the valuation evil proscribed in our *Marks* decision was the treatment of the condominium property therein as already subdivided into independent real estate parcels and then adding up the projected retail selling prices of those individual condominium units.

Appellants argue that their appraiser (Haberman) used and "relied on" a *discounted* gross sell-out (market) approach which treats the property under review as an *"undivided, vacant* multiple dwelling" (emphasis supplied) and measures "the present worth of unsold units between a single seller and a single buyer". Appellants contrast this to the gross sell-out approach which for condominium valuation simply aggregates "the pro-

jected retail prices to be received from the sale of the individual units".

The core of the purported *discounted* gross sell-out approach as used by Haberman is stated in his appraisal report, as follows:

### "Market Approach

"The market data (sales) approach to value is usually the most accurate method in estimating the value of a condominium. This appraiser has relied upon the actual unit sales of the Subject Property to determine the gross sell-out potential. Deductions from gross sell-out include estimates of holding and marketing cost (overhead) and developer's profit. Additional consideration is warranted in projecting the sell-out period in discounting anticipated cash flow.

"For purposes of this report, it is anticipated as of each tax status date that the Subject Property would require a period of two [2] years to sell-out".

Haberman's report shows that to determine that which he terms "gross sell-out potential" he aggregated the actual selling prices of the various units, then used averaging techniques to separately determine the "sell-out prices" of one, two and three bedroom units, which subtotals were totaled to determine the over-all "Potential Gross Sell-out" value for each year under review, which was then discounted for certain factors.

Haberman's calculations for the year 1978 are representative of his discounted gross sell-out technique:

|  | "[May] 1978 |
|---|---|
| "Potential Gross Sell-out* | $3,700,000. |
| "Less: Profit — 10% | 370,000. |
| "Sales — 2% | 75,000. |
| "Overhead — 3% | 110,000. |
| "Total Expenses: | $ 555,000. |
| "Net Before Return on "Capital: | $3,145,000. |
| "Average Semi-Annual Return "(net divided by 4) | 786,250. |
| "Present Worth Factor (X) | 3.57414 |
| "Present Worth of Subject "Property | $2,800,000. |

"*Exclusive of boat slip income".

Appellants argue that by thus treating the subject property as a *vacant, undivided* multiple dwelling type property and using the *discounted* gross sell-out *market* approach their appraiser simply valued the property in terms of its principal *potential* use, viz., condominium use, rather than rental use.

Appellants contend that since *Marks* prohibited only the gross sell-out approach of treating the property as if already subdivided and occupied, and adding up the unit sales prices which each condominium unit owner did or could obtain, the *discounted* gross sell-out approach (treating the property as if vacant, undivided and valuing it for its condominium *potential*) is *not* prohibited by law and, in fact, has the sanction of judicial authority in this State.

Preliminarily, appellants try to explain away the fact that on retrial of the *Marks* case, the court relied on the *income capitalization* method (treating the condominium property as hypothetical rental property) rather than using the discounted gross sell-out technique. Appellants allege that the reasons for this switch to income capitalization were *weight of the evidence* considerations, rather than any *legal insufficiency* of the market approach used by the county appraiser.

Appellants further argue that "[a]s a measure of cooperative or condominium conversion value, the use of the discounted gross sellout approach is consistent with tax certiorari court decisions which have given evidentiary weight to potential use value in a variety of valuation situations", viz., (1) considering the prices of prior sales of a property under review, which implicitly contain a potential use element; (2) considering developmental value of vacant land; (3) considering comparables in a whole to whole market data approach; and (4) considering fitness of comparables generally.

Appellants also cite the flexible approach viewpoint advanced in *Matter of Merrick Holding Corp. v Board of Assessors* (45 NY2d 538). Appellants' itemization of potential use cases, however, includes no appellate decisions involving and approving a discounted gross sell-out approach in valuing an already occupied subdivided condominium complex such as the property at bar.

Notwithstanding that fact, in the field of *cooperative* valuation, appellants do find support in this court's decision in *Matter of 200 Country Club Assoc. v Board of Assessors* (83 AD2d 637, 638, *supra*), which held: "The market-value method employed by appellants' appraiser clearly was not invalid as a matter of law (*Matter of River House-Bronxville v Gallaway* [79 AD2d 990],

*supra*). There is a sufficient nexus between the selling prices of the shares of a co-operative apartment complex and the value of that improved real estate to make the selling price competent and relevant on the issue of value, subject to adjustment and discount. Moreover, the market-value method as here applied remains subject to cross-examination into its purported weaknesses, including the fact that (1) all of the shareholders would not be likely to place their shares on the market at the same time; (2) if they did so, the market prices of those shares would likely be depressed; (3) the purchaser of an entire co-operative building (i.e., of all of the shares of a co-operative) would expect a discount in order to enable him to carry the building and still earn a profit; (4) the amount of the proper discount rate remains a matter of expert opinion; and (5) the prices of the shares might well reflect an increment of value commensurate with the personal property improvements within each apartment. These possible weaknesses in the market-value method are matters that may affect the weight of such market-value data, but they do not render such evidence incompetent or irrelevant as a matter of law. In fact, such studies may be as probative on the question of value as a valuation based upon imputing hypothetical rents, etc., to a nonrental building".

Thus, to a limited extent a discounted gross sell-out type approach did, at one time, have appellate sanction. In addition, there was the authority of the trial court determination in *Precision Dynamics Corp. v Tax Commn.* (86 AD2d 799, *affd* 56 NY2d 752) which, in a judgment entered June 23, 1981, confirmed assessments on "prime residential property * * * improved with a 15-story and penthouse fireproof building containing 63 apartments". When the Appellate Division, First Department, later affirmed that judgment in a decision dated February 11, 1982, Presiding Justice Murphy, in his dissent, noted (p 799): "The city appraiser, Marshall Ziring, valued the property on the basis that it had a co-operative potential in the Washington Square area. Ziring assessed the property at $1,300,000 for the tax years in question. He primarily relied upon two recent co-operative sales in that vicinity. In confirming the assessments, Special Term agreed with the city's appraiser that the property should be valued on the basis of its co-operative potential."

The majority stated, with respect to conversion potential (p 799): "The trial court's reference to the possibility of the conversion of the subject premises to co-operative apartments is somewhat unfortunate. Although that is an element which the trial court properly could have considered in determining assessed valuation, it is but one element and far from the most important, at

that. However, considering all of the elements which go into the makeup of value we are satisfied that the conclusion reached was a proper one, i.e., that it represented a price which a ready and willing buyer and a ready and willing seller would each consider an acceptable price."

When the Court of Appeals later affirmed *Precision* (56 NY2d 752, 753, *supra*), it stated, in pertinent part: "Indeed, any legal error that may have been made by the trial court in considering co-operative conversion potential as the sole indicator of value was corrected by the Appellate Division which accorded such potential little, if any, weight in its determination of valuation."

Thus, solely by virtue of the first trial decision in *Matter of River House-Bronxville v Hoffman* (101 Misc 2d 422, *supra* [1979]) our decision on appeal therefrom (79 AD2d 990, *supra* [Jan. 1981]), and our decision in *Matter of 200 Country Club Assoc. v Board of Assessors* (83 AD2d 637, *supra*), the sales prices and values of individual cooperative units could be aggregated and utilized to obtain a market approach total value, if the total were properly discounted. Further, by virtue of the *trial* judgment rendered in *Precision* (*supra*) on June 23, 1981 in the Supreme Court, New York County, cooperative conversion potential could be considered. These decisions, however, quickly triggered a legislative reaction.

■ It was against this 1981 decisional backdrop that the Legislature enacted a new statute, Real Property Tax Law § 581 (L 1981, ch 1057, eff Dec. 3, 1981). As originally enacted, section 581 provided, in pertinent part:

"§ 581. Assessment of residential cooperative, condominium and rental property. 1. Notwithstanding any other provision of law, real property owned or leased by a cooperative corporation or on a condominium basis shall be assessed for purposes of this chapter at a sum not exceeding the assessment which would be placed upon such parcel were the parcel not owned or leased by a cooperative corporation or on a condominium basis * * *

"2. Notwithstanding any other provision of law, real property occupied for residential purposes on a rental basis (as distinct from a cooperative or condominium basis) shall be assessed without regard to the value the property might have if converted to a cooperative or condominium basis or if sold or owned for the purpose of such a conversion."

This new statute was thus clearly designed to overturn (1) the cooperative valuation market data approach initially adopted by the trial court in the *River House* case; (2) this court's approval of that approach, implicitly in *Matter of River House-Bronxville*

*v Hoffman* (79 AD2d 990, *supra*) and explicitly in *Matter of 200 Country Club Assoc. v Board of Assessors* (*supra*); and (3) the utilization, reliance and endorsement of cooperative conversion potential as a valuation factor by the trial court in the *Precision* case (*see, Matter of River House-Bronxville v Gallaway,* 100 AD2d 970, 972, *supra*). Accordingly, at bar, although at the time of the trial in October 1982, there was some authority for a discounted gross sell-out approach, there was also the obstacle of Real Property Tax Law § 581.

## II

### DOES REAL PROPERTY TAX LAW § 581 BAR A DISCOUNTED GROSS SELL-OUT APPROACH OR IS IT CONSISTENT WITH THAT APPROACH?

In an obvious attempt to avoid the statutory roadblock of Real Property Tax Law § 581, appellants' second point argues that the discounted gross sell-out approach is *consistent* with the appraisal premise under subdivision 1 of that section. It is contended that when the appropriate rules of construction are applied to the new statute, it may be seen that the appraisal premises under that statute are the same as under Real Property Law § 339-y and case law involving the valuation of cooperatives (*e.g., Matter of 200 Country Club Assoc. v Board of Assessors, supra*). It is argued that Real Property Law § 339-y and Real Property Tax Law § 581 (which did not repeal Real Property Law § 339-y) have *identical* appraisal premises: "To wit, both condominiums and cooperatives are to be valued, for tax certiorari purposes, within the context of the single parcel value of the undivided development as a vacant multiple dwelling".

In this connection, the alleged *vacant undivided* multiple dwelling approach premise is purportedly borne out by a comparison between subdivisions 1 and 2 of Real Property Tax Law § 581. Appellants note that subdivision 2, which prohibits consideration of the potential for conversion of cooperative or condominium ownership, refers to property that is occupied. It is further contended that the concern in *Precision Dynamics Corp. v Tax Commn.* (86 AD2d 799, *affd* 56 NY2d 752, *supra*), was that conversion potential would be *speculative,* but that at bar, that would not be the case. Appellants argue: "The concern in *Precision Dynamics* over speculative valuations would certainly not be applicable to a successful condominium or cooperative development. In these situations, the appraisal problem facing the Court would consist of vacant multiple dwelling, unencumbered by the conversion obstacles associated with an occupied build-

ing. Furthermore, the conversion potential in a successful condominium or cooperative development would be supported by the property's actual history as such."

■ We find, however, no merit to appellants' contention that the discounted gross sell-out market data premise of their appraiser is consistent with Real Property Tax Law § 581. To utilize condominium conversion potential and, apparently, to avoid the impact of that statute, appellants have stripped the subject down to a hypothetical vacant, undivided multiple dwelling type premises, and then clothed the market data approach of its expert as a discounted gross sell-out approach that only considers the viewpoint of a single would-be buyer viewing that hypothetical multiple dwelling premises. However, it is clear that the market approach of appellants' expert is essentially the same aggregation of unit sales prices method (with appropriate discounts of the total) which the Legislature sought to prohibit by enacting Real Property Tax Law § 581 (*see, Matter of River House-Bronxville v Gallaway,* 100 AD2d 970, *supra*).

### III

CAN REAL PROPERTY TAX LAW § 581 (EFFECTIVE DECEMBER 3, 1981) APPLY TO ASSESSMENT YEARS AND TAX CERTIORARI PROCEEDINGS COMMENCED PRIOR TO ITS EFFECTIVE DATE?

Appellants' third principal contention is that if, arguendo, Real Property Tax Law § 581 (1) prohibits the "discounted gross sell-out approach", the prohibition must be *prospective* only.

It is contended that if section 581 now requires that the undivided parcel be valued as a *rental* project exclusive of its cooperative or condominium conversion potential, the statute is an alteration of pre-existing *substantive* law. According to appellants, Real Property Tax Law § 581 is applicable only to tax review proceedings commenced after the December 3, 1981 effective date and may not apply to the subject proceedings, all of which were commenced prior to that date. It is thus argued that since, at the time the *assessments* were made, consideration of *potential* condominium value could be and was permitted under the then existing market value standards, it would be improper to exclude in ensuing *tax certiorari* proceedings commenced prior to December 3, 1981, a material element of value allowed at the time the assessment under review was made.

As we held in *Matter of River House-Bronxville v Gallaway* (100 AD2d 970, 973, *supra*): "nothing short of an interlocutory determination will vest rights under an evidentiary statute that

has been replaced during the course of litigation". At bar, trial commenced on October 19, 1982 — nearly one year *after* the subject legislation went into effect. By necessity, the evidence had not been reduced to a protective interlocutory or other judgment before the December 3, 1981 effective date of section 581. In fact, appellants' discounted gross sell-out approach was advanced in the very teeth of that statute.

Although appellants argue that the discounted gross sell-out approach involves vested substantive legal rights and not merely a choice of multiple evidentiary routes (*e.g.,* State Equalization Rate Method of proving inequality) that could be the subject of legislative tinkering (*see, Matter of Slewett & Farber v Board of Assessors,* 54 NY2d 547; *Matter of Colt Indus. v Finance Administrator,* 54 NY2d 533; *Matter of Canigiani v Board of Assessors,* 98 AD2d 233), our second decision in *Matter of River House-Bronxville v Gallaway, supra*) upheld the applicability of Real Property Tax Law § 581 to valuation evidence pertaining to pre-December 3, 1981 tax dates presented in proceedings commenced prior to that date even where the trial occurs prior to that date but a decision and judgment is not rendered until after that date.

Finally, we note that Real Property Tax Law § 581 was deemed not applicable in *Precision Dynamics Corp. v Tax Commn.* (56 NY2d 752, *supra*). However, judgment had been entered in that case on June 23, 1981, i.e., *prior* to the December 3, 1981 effective date of Real Property Tax Law § 581. In contrast, in the instant case, the new statute was in effect when the trial of the subject proceedings commenced on October 19, 1982.

Accordingly, there should be an affirmance.

MOLLEN, P. J., TITONE and THOMPSON, JJ., concur.

Judgment of the Supreme Court, Nassau County, entered August 16, 1983, affirmed insofar as appealed from, with costs.