*490 OPINION OF THE COURT
David Demarest, J.
Special proceedings pursuant to article 7 of the Real Property Tax Law were consolidated and jointly tried, pursuant to stipulation of the parties, on July 1 and 2, 2002. The following parcels and tax years are at issue:
[[Image here]]
Petitioners do not challenge the assessments of the improvements on any of the parcels and have stipulated to the value of the improvements on the Santa Clara common lands. Challenges other than those listed were discontinued by stipulation.
The parties have stipulated to the equalization rates that apply for each town for the applicable years in issue.
Based upon the stipulations of the parties, and the proof presented at trial, I make the following:
*491 Findings of Fact
Bay Pond Park is a large tract of mostly undeveloped land in the northern Adirondacks originally owned by the Rockefeller family as a private, wilderness reserve. It straddles two towns, Waverly and Santa Clara, with the St. Regis River running through it. For many years it had been used as an exclusive family retreat for recreation — primarily hunting, fishing, hiking and canoeing. In 1979, the then-current owners gave a conservation easement to the Nature Conservancy to maintain the property in its “natural, aesthetic and open space character and scenic beauty.” Although the owners relinquished considerable development rights, they retained the ability to exclude the public, and to mine and timber to a limited degree. The granting of the conservation easement enabled the owners to take a charitable deduction of $1,117,500. There has been no commercial timbering, nor any other commercial activity, for more than 20 years.
The timber values as of January 1, 2000 for the Santa Clara common lands is $2,998,238 and for the Waverly common lands is $6,235,794.
Being within the Adirondack Park, zoning is governed by the Adirondack Park Agency (APA) which has designated the parcels as “Resource Management,” requiring a minimum of 43 acres for each dwelling unit.
In 1985, the owners sought to reduce the costs of maintaining the estate without substantially diminishing their individual rights to use the entire property. A Condominium Plan was developed establishing 12 discrete building lots along the shores of Bay Pond, the largest body of water on the parcel. Although of various sizes, all were less than the 43-acre APA minimum. Nevertheless, the APA approved the plan, since the vast majority of the lands would be henceforth development free. Each building lot’s owner would also own an undivided l/12th interest in the 8,200 acres in Santa Clara and 13,139 acres in the Town of Waverly.
The Condominium Plan contains strict bylaws and rules for ownership, development, leasing and resale, meant to further the family’s commitment to maintaining a pristine wilderness recreation retreat. Of the 12 building lots, 2 contained existing residential structures. The remaining 10 were to be marketed to a limited number of persons, preferably friends and family members, with the ability and- desire to further that commitment.
*492 Lots 1, 2, 3, 4 and 5 were transferred to original family owners. In 1987, lot 7 was sold to John Adams for the asking price of $375,000. After this sale, the list price of the remaining lots was raised to $400,000. Four lots were sold for that price — in 1989, lot 11 to Craig and Constance Weatherup; in 1993, lot 10 to the Weatherups; in 1997, lot 6 to Timothy C. Collins; in 1998, lot 9 to Florence L. Short. In 1997, the remaining two lots were sold for $40,000 each — lot 8 to Nicholas Adams, son of John Adams, and lot 12 to the Weatherups. These last two sales were with restrictions as to resale and were done to insure a full complement of ownership available to share common expenses.
Beginning in 1986, the condominium lots had been extensively advertised in media designed to attract buyers of exclusive, upscale properties. They were listed with a national real estate brokerage who co-brokered the listing with local realtors. All lots, except the last two, sold for their asking price and there have been no resales. Of the four extended families who are present owners, three were strangers to the land who became interested either through advertising or word of mouth. Thus, five of the sales were bona fide arm’s length transactions.
There was a substantial divergence of opinion as to the value of the common areas.
Both appraisers relied exclusively upon the sales comparison approach in determining land value. Petitioner’s appraiser relied upon sales of the subject parcels, while respondent’s expert did not. His appraisal report states:
“According to cases under Section 339y of the RPL and Section 581 of the RPTL as an appraiser, I am to ignore the sale prices of the individual units. As a result, the conclusions that are made a part of this report may not constitute usual market value opinions but rather market value opinions as directed by the appropriate statutes referred to above.” (Petitioner’s exhibit A at iv.)
Discussion of Applicable Law
Real estate appraising is a science, but an inexact one, relying heavily on pragmatic methods to answer factually unique questions. These cases provide several of those unique questions and statutory and case law precedent are not particularly helpful for resolution.
The central issue in these proceedings is the applicability of Real Property Law § 339-y and Real Property Tax Law § 581, *493 and the cases construing those statutes, to the subject parcels. Both statutes were enacted to deal with conversion of single owner multiple dwellings to cooperatives and condominiums. Real Property Law § 339-y provides that each unit and its common interest shall be deemed a separate parcel subject to separate assessment and taxation. Neither the building, the property, nor any of the common elements shall be deemed to be a parcel. “In no event shall the aggregate of the assessment of the units plus their common interests exceed the total valuation of the property were the property assessed as a parcel.” (Real Property Law § 339-y [1] [b].)
This directive is echoed in RPTL 581 (1) (a): “Notwithstanding any other provision of law, real property owned or leased * * * on a condominium basis shall be assessed for purposes of this chapter at a sum not exceeding the assessment which would be placed upon such parcel were the parcel not owned or leased * * * on a condominium basis.”
“The statute means what it says, and was so intended.” (Matter of Marks v Belcher, 58 AD2d 812, 812 [2d Dept 1977], affd 49 NY2d 954 [1980].) It reflects a legislative determination to encourage condominium ownership by placing a ceiling on an assessment despite the fact the resulting assessment might not reflect the “full value” of an individual unit.
In every reported case which has discussed these statutes, the subject was a typical multiple dwelling condominium, not a large, wilderness recreational retreat. Because the majority of the subject consists of vacant land, the applicability of that precedent is minimal.
This has been recognized by the parties themselves. They admit the method of assessing the common areas by the respondents is technically prohibited by Real Property Law § 339-y, but since the common areas straddle two towns, they acknowledge the need to divide the assessments and do not challenge the assessments as illegal.
Case law also suggests that condominium property should be valued using an income capitalization approach. (Matter of Southern Westchester Assoc. v Assessor of City of Yonkers, 122 AD2d 212 [2d Dept 1986]; Matter of South Bay Dev. Corp. v Board of Assessors & / or Assessor of County of Nassau, 108 AD2d 493 [2d Dept 1985].) Again, both parties and their appraisers recognize that such a method is totally inappropriate for the subject, since there are no comparable income producing properties to compare it with. Both relied exclusively upon a sales comparison method.
*494 In passing Real Property Law § 339-y and RPTL 581, the clear legislative intent was to limit the assessments of condominium properties to their value as stand alone properties. Because, historically, the sales prices of individual units when aggregated would far exceed that value, assessors were prohibited from solely using those sales prices in fixing assessments. That is not to say actual sales prices might be of some use in reaching value determinations. (Matter of Board of Mgrs. of Harbor Condominiums v Board of Assessors of Vil. of Lake Placid, 238 AD2d 825 [3d Dept 1997], lv denied 91 NY2d 802 [1997]; Matter of Southern Westchester Assoc. v Assessor of City of Yonkers, 122 AD2d 212 [2d Dept 1986].)
Recent sales of a subject property, if legitimate and arm’s length, must be accorded significant weight in determining the value of property. After all, the value of a property is really established in the free marketplace. It is the amount a willing buyer will pay a willing seller. Recent sales, if not extraordinary, lessen the need of the appraiser or the court to engage in speculation. (Plaza Hotel Assoc. v Wellington Assoc., 37 NY2d 273 [1975]; Matter of Lovett v Assessor of Town of Islip, 298 AD2d 521 [2d Dept 2002]; ERC Community Warehouse v Whalen, 266 AD2d 788 [3d Dept 1999].)
The evidence presented at trial established that five sales of the subject were normal arm’s length market sales. Extensive, appropriate marketing was performed. Although offers to purchase the properties for less than the asking price were made, they were rejected. For the most part the buyers and sellers were strangers, well informed, typically motivated, and the payments were in cash, without unusual or creative financing.
There is no legal basis for respondents’ appraiser to have ignored these sales. Indeed, as concluded by petitioners’ appraiser, they are the best evidence of the value of the subjects.
Respondents’ appraisal is also flawed in relying heavily upon the value of the properties as potential timber resources. Both sides acknowledge that for real property tax assessment purposes, property must be assessed according to its existing use on the taxable status date. (Matter of duPont Ross v Town of Santa Clara, 266 AD2d 678 [3d Dept 1999].) This property has always been used as a large wilderness retreat, and pursuant to its Condominium Plan and conservation easement, will always be so used. In all the years at issue, it was never commercial timberland. Reliance upon timber resource lands required significant subjective adjustments which rendered *495 their use as comparable sales suspect, particularly in light of the existence of actual sales.
Respondents’ appraiser’s conclusion that waterfront properties in the Adirondacks were increasing in value at a rate of 8.5% per year for the years at issue here is also incredible. He relied on only four sales and resales, none within the Towns of Waverly or Santa Clara. By ignoring the subject’s sales, which showed no increase in value over that period, he overlooked the best evidence of any trends.
Respondents argue that petitioners’ appraiser placed a “cap” on the value of the whole property by assuming a $400,000 value for each l/12th interest and multiplying it by 12 to determine value. Calling this a “cap” is misleading. It is actually a pragmatic and realistic assessment of value using actual sales. While such an approach would be statutorily impermissible were it to yield a result far in excess of the values for comparable unencumbered parcels, it is appropriate in this case. The argument that actual sales should be ignored because of the mandates of Real Property Law § 339-y and RPTL 581 would require an evaluation replete with speculation and subjective assumptions while disregarding economic facts. Respondents cannot use laws designed to limit assessments to create artificial values that ignore the marketplace.
Respondents also rely heavily on their assumption that the decision of this court as affirmed by the Appellate Division in Matter of duPont Ross v Town of Santa Clara (266 AD2d 678 [3d Dept 1999]) stands for the proposition that a conservation easement can never devalue private recreational type estates. It does not. While the duPont Ross tract and Bay Pond are adjacent and contain similar land, they are not the same. In addition to the conservation easement that each gave to the Nature Conservancy, Bay Pond is further encumbered by the Condominium Plan. While the duPont Ross estate is potentially marketable in its entirety, Bay Pond is not. Bay Pond’s common areas can never be developed, whereas the duPont Ross estate has retained the right to some limited development. The duPont Ross estate can be developed or timbered upon the decision of a single owner, while Bay Pond’s development requires a two-thirds vote of all the owners. Most telling is that Bay Pond has a sales history which was unavailable to the appraisers in duPont Ross.
There is yet another reason to credit the petitioners’ appraisal over the respondents’. Despite a pretrial stipulation as *496 to timber values, the respondents’ appraiser chose to substitute his own opinions as to those values, despite his admitted lack of expertise. This produced an opinion that timber values on one contiguous parcel differed because they were in different taxing jurisdictions. These opinions were not supported by the credible evidence available.
Conclusions of Law
Based upon the proof submitted and the determination that assumptions made by the respondents’ appraiser were erroneous, his appraised values are found to be unsupportable. Petitioners’ appraisal provides defensible opinions of value and is supported by substantial evidence sufficient to overcome the presumption of validity of the assessments.
The parties are directed to settle a judgment, adjusting the assessments to conform with the appraised values of the petitioners’ appraisal where such values support a reduction.